IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Jane Doe 9, | ) | |
| Plaintiff, | ) | **C.A. No. 6:22-3509-HMH** |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| Varsity Brands, LLC; Varsity Spirit, LLC; | ) | |
| Varsity Brands Holding Company, Inc.; | ) | |
| U.S. All Star Federation, Inc. d/b/a U.S. All | ) | |
| Star Federation; USA Federation for Sport | ) | |
| Cheering d/b/a USA Cheer; Charlesbank | ) | |
| Capital Partners, LP; Bain Capital, LP; | ) | |
| Jeff Webb, individually; Rockstar Cheer & | ) | |
| Dance, Inc.; Katherine Anne Foster, as | ) | |
| the personal representative of the Estate of | ) | |
| Scott Foster; Kathy Foster, individually; | ) | |
| Josh Guyton; Traevon Black a/k/a Trey | ) | |
| Black n/k/a Tracey Black; and other | ) | |
| unknown defendants, | ) | |
| | ) | |
| Defendants. | ) | |

Before the court are Defendants Bain Capital, LP's ("Bain") and Charlesbank Capital

Partners, LP's ("Charlesbank") motions to dismiss Plaintiff's complaint under Federal Rules of

Civil Procedure 12(b)(2) and 12(b)(6). For the reasons below, the court grants Bain's and

Charlesbank's motions.

## I. BACKGROUND

Plaintiff is a former youth cheerleader who alleges that she was sexually abused by a

coach employed by Defendant Rockstar Cheer & Dance, Inc. ("Rockstar Cheer"), a cheerleading

gym affiliated with the Varsity Defendants.[1] In addition to pursuing claims against the

---

[1] The court refers to Defendants Varsity Brands, LLC ("Varsity Brands"), Varsity Brands
Holding Company, Inc. ("Varsity Holding"), and Varsity Spirit, LLC ("Varsity Spirit")
collectively as "Varsity" or the "Varsity Defendants."

individual coach and Rockstar Cheer, Plaintiff seeks to hold Varsity, Jeff Webb ("Webb"), Bain,

Charlesbank, and competitive cheerleading's governing bodies – USA Federation for Sport

Cheering ("USA Cheer") and U.S. All Star Federation ("USASF") – liable for misrepresenting

the safety of Varsity gyms and competitions and failing to adopt and enforce adequate athlete-

safety policies and procedures.  The facts below are taken from Plaintiff's complaint and are

accepted as true for purposes of the present motions.  Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009).[2]

### A. Overview of All Star Cheerleading

Unlike traditional sideline cheerleading, All Star cheerleading is a competition-based

sport unto itself.  (Compl. ¶¶ 31-32, ECF No. 1.)  All Star cheer teams compete by performing

two-and-a-half minute routines set to music, which incorporate elements of tumbling, stunting,

cheer, and dance.  (Id. ¶ 31, ECF No. 1.)  According to Plaintiff, over four million athletes

across the United States participate in All Star cheerleading at some level, with many training

and competing year-round.  (Id. ¶¶ 33, 35, ECF No. 1.)  This level of commitment is expensive:

a single season costs anywhere from $3,000 to $7,000 per athlete, while some families spend

more than $20,000 a year for transportation, lodging, membership fees, merchandise, and

uniforms.  (Id. ¶ 34, ECF No. 1.)

The beginnings of the competitive cheerleading industry can be traced to Webb's

founding of the predecessor to Varsity Spirit in 1974.  (Id. ¶ 41, ECF No. 1.)  Varsity Spirit

---

[2] This case is one of four cases before the court involving similar allegations of sexual
assault and essentially the same defendants.  6:22-cv-2957-HMH, 6:22-cv-03508-HMH,
6:22-cv-03510-HMH.  Bain and Charlesbank have moved to dismiss the other three cases as
well.  Those motions will be addressed in separate orders.

began as a provider of educational training camps for cheerleaders and has since expanded into selling uniforms and apparel and organizing cheer competitions. (Compl. ¶¶ 41-43, ECF No. 1.) It now controls an estimated 80-90% of the All Star cheer market. (Id. ¶ 45, ECF No. 1.) From 2014 to 2018, Varsity was wholly owned by Charlesbank, a Boston-based company. (Id. ¶¶ 27, 105, ECF No. 1.) Today, Varsity is owned by another Boston-based company – Bain – which purchased Varsity in 2018 for $2.8 billion.[3] (Id. ¶¶ 28, 107, ECF No. 1.)

Two governing bodies oversee competitive cheerleading in the United States: USASF and USA Cheer. (Id. ¶¶ 25, 80, 84, 86, ECF No. 1.) Plaintiff maintains that Varsity was heavily involved in creating and operating both organizations. For example, Varsity allegedly advanced a $1.8 million interest-free loan to help launch USASF, submitted USASF's trademark application, and for at least fifteen years, housed USASF's offices at its corporate address and paid USASF's employees directly. (Compl. ¶¶ 79, 88-90, ECF No. 1.) Varsity also continues to control a majority of the seats on USASF's board of directors, including all seats with voting rights. (Id. ¶ 91, ECF No. 1.) Similar to USASF, USA Cheer was purportedly created in 2007 with the help of an interest-free loan from Varsity, listed "Varsity's Tennessee headquarters as its own," and at one time had six Varsity employees on its board. (Id. ¶¶ 84-85, 94, ECF No. 1.)

As a result of Webb's and Varsity's ties to cheerleading's governing bodies, Plaintiff contends, Webb and Varsity "were entirely self-regulated" and could control "all aspects of All-Star cheer." (Id. ¶¶ 77, 99, ECF No. 1.) As examples, Plaintiff points out that:

•    All Star athletes must buy a USASF membership to compete at Varsity events. (Id. ¶ 48, ECF No. 1.)

---

[3] At the same time, Plaintiff alleges that "Charlesbank made a new investment in Varsity alongside . . . Bain and retained a minority stake in the business." (Compl. ¶ 107, ECF No. 1.)

- All Star athletes are required to pay annual or monthly dues to Varsity and their local Varsity-affiliated gym for "competition attendance, uniforms, accessories, and other related fees." (Compl. ¶ 53, ECF No. 1.)

- "Gyms and coaches likewise pay monthly or annual fees to USASF, USA Cheer and the Varsity Defendants." (Id. ¶ 54, ECF No. 1.)

- Affiliate gyms are required "to sign multi-year supply contracts whereby the gyms are paid cash rebates from Varsity Spirit, LLC for buying [its] merchandise and for sending athletes to Varsity events." (Id. ¶ 51, ECF No. 1.)

- "[M]embership in USASF[] and with a Varsity-affiliated gym mandates competing in a specified number of annual [V]arsity events." (Id. ¶ 58, ECF No. 1.)

- Athletes and their families must purchase rooms at Varsity-selected hotels while at Varsity competitions; the failure to do so "subjects the athlete to disqualification." (Id. ¶ 60, ECF No. 1.)

### B. Scott Foster and the Rockstar Cheer Gym

Defendant Scott Foster cheered collegiately at the University of Louisville, "a pre-eminent [sic] name in the world of competitive cheerleading," and began coaching youth cheerleaders in Kentucky in 1996. (Compl. ¶¶ 169-70, ECF No. 1.) Shortly after moving to Greenville, South Carolina in 1999, Scott Foster opened an All Star cheer gym together with his wife, Defendant Kathy Foster. (Id. ¶ 172, ECF No. 1.) The couple at one point also operated World Spirit Federation, a competition cheerleading company, before selling the company to Varsity Brands in 2006. (Id. ¶ 173, ECF No. 1.) A year later, in 2007, Scott and Kathy Foster opened Rockstar Cheer in Greenville. (Id. ¶ 174, ECF No. 1.) Rockstar Cheer's stated mission was "[t]o provide a structured environment of competitive cheerleading while accomplishing our goals [and] to teach dedication, commitment, self-confidence, teamwork, discipline, responsibility, and leadership in a family-friendly, safe and fun environment." (Id. ¶ 175, ECF No. 1.) To this end, USASF certified Rockstar Cheer "as meeting All-Star standards with

respect to coach credentials, program quality, and athlete safety." (Compl. ¶ 176, ECF No. 1.)
According to Plaintiff, this meant that USASF "warrant[ed] that [Rockstar Cheer], its coaches,
and its choreographers were safe[] and followed best practices . . . to prevent athlete abuse."
(Id. ¶ 50, ECF No. 1.)

In 2018, one of Rockstar Cheer's teams, Beatles, won Varsity's World Championship
title. (Id. ¶ 179, ECF No. 1.) This accomplishment "further elevated Rockstar's status" and
allowed Scott and Kathy Foster "to recruit athletes nationwide." (Id. ¶¶ 178-79, ECF No. 1.)

### C. Plaintiff's Allegations of Abuse

Jane Doe 9 was thirteen years old and living in Virginia when she began cheering for
Rockstar Cheer. (Id. ¶ 211, ECF No. 1.) Jane Doe 9 would commute seven hours each weekend
to train at Rockstar Cheer in Greenville, South Carolina, returning home Sunday night to attend
school the following Monday. (Compl. ¶ 212, ECF No. 1.) When she was fifteen years old, she
began "spen[ding] a lot of time" at the "Rockstar house" – an apartment known for "partying
and illicit drug use" by Rockstar Cheer coaches. (Id. ¶ 217, ECF No. 1.) Jane Doe 9 claims that
she was provided with alcohol, cocaine, MDMA, LSD, and psychedelic mushrooms by Rockstar
Cheer coaches, including Defendant Traevon Black a/k/a Trey Black n/k/a Tracey Black
("Black"), at the Rockstar house. (Id. ¶ 219, ECF No. 1.) She also describes one occasion when
Black drove her to Piedmont, South Carolina and purchased her cocaine. (Id. ¶ 221, ECF No.1.)

Around this time, Defendant Josh Guyton ("Guyton"), another Rockstar Cheer coach,
began sending Jane Doe 9 sexually explicit Snapchat messages and requesting that she send him
nude photographs of herself. (Id. ¶ 223, ECF No. 1.) In April 2017, while at a cheer
competition in Florida, Guyton allegedly took Jane Doe 9 to his vehicle and sexually assaulted

her.  (Compl. ¶ 224, ECF No. 1.)  Plaintiff alleges that she was heavily intoxicated at the time

and that Guyton knew she was underage.  (Id. ¶¶ 223-24, ECF No. 1.)

Since leaving Rockstar Cheer in 2019, Jane Doe 9 has struggled with substance abuse,

bipolar disorder, and depression.  (Id. ¶ 227, ECF No. 1.)

### D. Procedural History

Plaintiff filed her complaint on October 11, 2022.  Against Bain and Charlesbank, she

asserts statutory claims under the Child Abuse Victims' Rights Act of 1986 ("CAVRA"), 18

U.S.C. § 2255, and the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. §§ 1962(c) and (d), along with common-law claims for gross negligence, unjust

enrichment, negligent security, and civil conspiracy.  (Compl., ECF No. 1.)  On December 19,

2022, Bain and Charlesbank filed separate motions to dismiss for lack of personal jurisdiction

under Rule 12(b)(2) and failure to state a claim under Rule 12(b)(6).  (Bain Mot. Dismiss, ECF

No. 46); (Charlesbank Mot. Dismiss, ECF No. 48.)  Plaintiff responded to both motions on

January 19, 2023.  (Resp. Opp'n Bain Mot. Dismiss, ECF No. 62); (Resp. Opp'n Charlesbank

Mot. Dismiss, ECF No. 61.)  Bain and Charlesbank each replied on February 2, 2023.[4]  (Bain

Reply, ECF No. 72); (Charlesbank Reply, ECF No. 74.)  This matter is now ripe for decision.[5]

---

[4]  On March 1, 2023, Plaintiffs in the 6:22-2957 case filed a motion before the United
States Judicial Panel on Multidistrict Litigation seeking to transfer all related, pending civil
actions filed in districts throughout the United States.  See Motion to Transfer, In re Varsity
Spirit Athlete Abuse Litig., MDL No. 3077, ECF No. 1.  The motion to transfer was denied on
June 5, 2023.  In re Varsity Spirit Athlete Abuse Litig., MDL No. 3077, 2023 WL 3828645
(J.P.M.L. June 5, 2023).

[5]  Under Local Rule of Civil Procedure 7.08, the court may decide motions without a
hearing.

## II. LEGAL STANDARDS

### A. Rule 12(b)(2)

Federal Rule of Civil Procedure 12(b)(2) allows a defendant to move to dismiss a complaint for lack of personal jurisdiction. "Where, as here, the . . . court decides jurisdiction on the motion papers alone, the plaintiff need only make a 'prima facie showing of a sufficient jurisdictional basis' to prevail." Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 188 (4th Cir. 2016) (quoting Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)). In deciding whether the plaintiff has made such showing, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Combs, 886 F.2d at 676. The court will not, however, "credit conclusory allegations or draw farfetched inferences." Sonoco Prods. Co. v. ACE INA Ins., 877 F. Supp. 2d 398, 405 (D.S.C. 2012) (quoting Masselli & Lane, PC v. Miller & Schuh, PA, No. 99-2440, 2000 WL 691100, at *1 (4th Cir. 2000) (unpublished)).

### B. Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "'[D]etailed factual allegations'" are not required, but the plaintiff must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). In reviewing the complaint, the court "must accept the

factual allegations of the complaint as true and construe them in the light most favorable to the nonmoving party." Rockville Cars, LLC v. City of Rockville, 891 F.3d 141, 145 (4th Cir. 2018).

## III. DISCUSSION

The court begins with Bain's and Charlesbank's personal jurisdiction arguments under Rule 12(b)(2). Ruhrgas AG v. Marathon Oil, Inc., 526 U.S. 574, 583 (1999) ("Personal jurisdiction . . . is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'" (quoting Employers Reinsurance Corp. v. Bryant, 299 U.S. 374, 382 (1937))).

There are two ways Plaintiff can establish personal jurisdiction over Bain and Charlesbank: "(1) the nationwide service of process provisions of [RICO or the CAVRA] and then pendent personal jurisdiction over the state causes of action or (2) by a traditional minimum contacts and due process analysis for all causes of action." Sadighi v. Daghighfekr, 36 F. Supp. 2d 267, 271 (D.S.C. 1999). The court considers the latter route first.

### A. Whether Bain and Charlesbank Are Subject to General or Specific Jurisdiction in South Carolina

Broadly speaking, personal jurisdiction refers to "the court's power to exercise control over the parties." Leroy v. Great W. United Corp., 443 U.S. 173, 180 (1979). A federal court may exercise personal jurisdiction over a nonresident defendant if (1) the forum state's long-arm statute authorizes the exercise of jurisdiction and (2) the exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. Ellicott Mach. Corp. v. John Holland Party Ltd., 995 F.2d 474, 477 (4th Cir. 1993). Where, as here, the forum state's long-arm statute

extends to the limits of federal due process, the two-part inquiry collapses into one: whether the court's exercise of personal jurisdiction satisfies the Fourteenth Amendment's Due Process Clause.  Foster v. Arletty 3 SARL, 278 F.3d 409, 414 (4th Cir. 2002).  The Fourteenth Amendment prevents a federal court from exercising jurisdiction unless the defendant has "such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable' . . . and 'does not offend traditional notions of fair play and substantial justice.'"  Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316-17 (1945)).

The Supreme Court has recognized two types of personal jurisdiction: general and specific.  Id.  General jurisdiction attaches when a defendant's connections with the forum "are so continuous and systematic as to render them essentially at home in the forum State."  BNSF Ry. Co. v. Tyrrell, 581 U.S. 402, 413 (2017) (internal quotation marks omitted).  Save for the "exceptional case," a corporate defendant is "at home" only in its "place of incorporation and principal place of business."  Daimler AG v. Bauman, 571 U.S. 117, 137, 139 n.19 (2014).  General jurisdiction does not exist in this case because both Bain and Charlesbank are incorporated and maintain their principal place of business in Massachusetts.  (Compl. ¶¶ 27-28, ECF No. 1.)

The second type of personal jurisdiction – specific jurisdiction – exists when a case "aris[es] out of or relate[s] to the defendant's contacts with the forum."  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n. 8 (1984).  To determine whether specific jurisdiction exists, courts in the Fourth Circuit consider "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether

9

the plaintiff's claims arise out of those activities directed at the state; and (3) whether the

exercise of personal jurisdiction would be constitutionally 'reasonable.'" <u>Carefirst of Md., Inc.</u>

<u>v. Carefirst Pregnancy Ctrs., Inc.</u>, 334 F.3d 390, 397 (4th Cir. 2003) (quoting <u>ALS Scan, Inc. v.</u>

<u>Digital Serv. Consultants, Inc.</u>, 293 F.3d 707, 711-12 (4th Cir. 2002)). "The plaintiff must

prevail on each prong." <u>Perdue Foods LLC v. BRF S.A.</u>, 814 F.3d 185, 189 (4th Cir. 2016).

For the first prong, a defendant has purposefully availed itself of the benefits and

protections of the forum state's law if "the defendant deliberately has engaged in significant

activities within [the forum]" or "has created continuing obligations between [itself] and

residents of the forum." <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 475-76 (1985)

(internal quotation marks omitted). This purposeful-availment standard "ensures that a

defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or

attenuated contacts," or due to "the unilateral activity of another party or a third person."

<u>Id.</u> at 475 (internal quotation marks omitted).

For the second prong – whether the plaintiff's claims arise out of or relate to the

defendant's activities directed at the forum – "there must be an affiliation between the forum

and the underlying controversy, principally, [an] activity or an occurrence that takes place in the

forum State." <u>Bristol-Myers Squibb Co. v. Super. Ct. of Cal.</u>, 582 U.S. 255, 262 (2017)

(internal quotation marks omitted and alteration in original). "When there is no such

connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected

activities in the State." <u>Id.</u>

At the final prong, the court considers whether the exercise of jurisdiction "would comport with 'fair play and substantial justice.'" Burger King, 471 U.S. at 476 (quoting Int'l Shoe, 326 U.S. at 320). In doing so, the court weighs "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 217 (4th Cir. 2001) (quoting Burger King, 471 U.S. at 477).

Applying these principles, the court finds that Plaintiff falters at the first prong of the specific-jurisdiction analysis as to both Defendants. Nothing in Plaintiff's complaint suggests that Bain or Charlesbank purposefully availed themselves of the privilege of doing business in South Carolina. There is no evidence, for example, that either Defendant maintains offices or agents in South Carolina, owns property in South Carolina, has reached into South Carolina to solicit or initiate business, has engaged in significant or long-term business activities in South Carolina, or is bound by any relevant contract with a South Carolina choice-of-law provision. See Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009); Foster, 278 F.3d at 415 (finding no purposeful availment when defendants maintained no offices, agents, or employees in South Carolina and did not advertise in the state). Nevertheless, Plaintiff asks the court to exercise jurisdiction over Bain and Charlesbank based on Bain's and Charlesbank's ownership interests in Varsity and the allegation that they "provided funding to market [competitive cheer] programs for the Varsity Defendants and obtained financial rewards from

having done so." (Compl. ¶¶ 105-07, 205-07, ECF No. 1); (Resp. Opp'n Bain Mot. Dismiss

11-12, ECF No. 62); (Resp. Opp'n Charlesbank Mot. Dismiss 11-13, ECF No. 61.)

Merely owning a subsidiary or portfolio company that routinely conducts business within

the forum, however, does not constitute purposeful availment. Saudi v. Northrop Grumman

Corp., 427 F.3d 271, 276 (4th Cir. 2005) ("[T]he contacts of a corporate subsidiary cannot

impute jurisdiction to its parent entity."); see Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S.

333, 336-37 (1925). Rather, to obtain personal jurisdiction over a parent, a plaintiff "must show

that the subsidiary functions as the agent or mere department of the parent." Builder Mart of

Am., Inc. v. First Union Corp., 563 S.E.2d 352, 358 (S.C. Ct. App. 2002), overruled on other

grounds by Farmer v. Monsanto Corp., 579 S.E.2d 325 (S.C. 2003). Here, Plaintiff does not

even attempt to argue that Bain or Charlesbank exercises pervasive control over Varsity's day-

to-day operations or that the entities fail to observe corporate formalities.[6] Id. (stating that

courts consider four factors in an alter-ego analysis: "(1) common ownership, (2) financial

independence, (3) degree of selection of executive personnel and failure to observe corporate

formalities, and (4) the degree of control over marketing and operational policies"). These

shortcomings undermine any attempt by Plaintiff to impute personal jurisdiction over Bain and

Charlesbank based on Varsity's contacts with South Carolina. Id. ("It is essential that *all four

factors be present with sufficient factual specificity* to confer jurisdiction." (emphasis in

original)).

---

[6] Although Plaintiff claims that Varsity, USASF, USA Cheer, Bain, Charlesbank, and
Rockstar Cheer "all affirmatively and collectively represent themselves as one All-Star family,
rather than separate parents and subsidiaries," (Compl. ¶ 202, ECF No. 1), that is a conclusory
allegation that the court need not accept, Iqbal, 556 U.S. at 678.

In short, Plaintiff has offered no facts either to show that Bain and Charlesbank engaged in any South Carolina-directed conduct or to overcome the presumption of corporate separateness. As a result, the only remaining avenue for Plaintiff to establish personal jurisdiction over Bain and Charlesbank is the nationwide-service-of-process provisions of RICO or the CAVRA.[7] Sadighi, 36 F. Supp. 2d at 271; Taylor v. Bettis, 976 F. Supp. 2d 721, 748 (E.D.N.C. 2013).

**B. Whether the Court Has Personal Jurisdiction Over Bain and Charlesbank Under RICO or the CAVRA**

Under Federal Rule of Civil Procedure 4(k)(1)(C), "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." RICO's nationwide-service-of-process provision, 18 U.S.C. § 1965(d), provides that process "may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." To similar effect, the CAVRA allows for service of process on a defendant in an action brought under 18 U.S.C. § 2255 "in any district in which the defendant . . . is an inhabitant [or] may be found." Id. § 2255(c)(2); see also Ramsbottom v. Ashton, No. 3:21-CV-00272, 2022 WL 106733, at *13 (M.D. Tenn. Jan. 11, 2022) (unpublished) ("Numerous courts . . . have concluded that identical language for service of process in any district in which the defendant either 'is an inhabitant' or 'may be found'

---

[7] Plaintiff alternatively argues that she is entitled to jurisdictional discovery to determine the full extent of Bain's and Charlesbank's contacts with South Carolina. A court may deny such a request "[w]hen a plaintiff offers only speculation or conclusory assertions about contacts with a forum state . . . ." Carefirst, 334 F.3d at 402. Based on the above analysis, the court has no basis to conclude that discovery might unearth facts sufficient to confer specific jurisdiction over Bain or Charlesbank. Accordingly, Plaintiff's request to conduct jurisdictional discovery is denied.

'authorizes nationwide service of process' and, thus, also provides 'the statutory basis for personal jurisdiction.'" (quoting Peay v. BellSouth Med. Assistance Plan, 205 F.3d 1206, 1210 (10th Cir. 2000) (finding "no question" that identical language in 29 U.S.C. § 1132(e)(2) authorizes nationwide services of process in ERISA cases))).

When a plaintiff relies on a federal statute providing for nationwide service of process, the court will have personal jurisdiction over a properly served defendant provided that (1) the federal claim is colorable, and (2) the exercise of personal jurisdiction satisfies the Fifth Amendment's Due Process Clause.  See ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 627-29 (4th Cir. 1997); Nunes v. Fusion GPS, 531 F. Supp. 3d 993, 1003-04 (E.D. Va. 2021).  Both requirements are met in this case.

As for the first requirement, Plaintiff's RICO and CAVRA claims against Bain and Charlesbank are "at least arguable and nonfrivolous."  D'Addario v. Geller, 264 F. Supp. 2d 367, 389 (E.D. Va. 2003) (emphasis removed).  In other words, the claims are not "wholly immaterial or insubstantial so as to deprive Plaintiff of [her] right to rely on RICO's [and the CAVRA's] nationwide-service-of-process provision[s]."  Fusion GPS, 531 F. Supp. 3d at 1004 (internal quotation marks omitted); Republic of Pan. v. BCCI Holdings (Lux.) S.A., 119 F.3d 935, 941 (11th Cir. 1997) ("When a jurisdictional motion to dismiss depends . . . on the assertion of a right created by a federal statute, the court should dismiss for lack of jurisdiction only if the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy." (internal quotation marks omitted)).  The court emphasizes the limited scope of this holding, however, as whether a federal claim is colorable for jurisdictional purposes is a distinct question from whether the

14

claim is plausible for Rule 12(b)(6) purposes.  <u>Fusion GPS</u>, 531 F. Supp. 3d at 1004; <u>In re Takata Airbag Prods. Liab. Litig.</u>, 396 F. Supp. 3d 1101, 1144 (S.D. Fla. 2019); <u>cf. Davis v. Featherstone</u>, 97 F.3d 734, 737-38 (4th Cir. 1996) (stating, in the ERISA context, that "[a] claim is colorable if it is arguable and nonfrivolous, whether or not it would succeed on the merits").

As for the second requirement, Bain and Charlesbank have sufficient contacts with the United States as a whole such that the court's exercise of personal jurisdiction would not violate the Fifth Amendment.  To start, the nationwide minimum-contacts component is satisfied, as both Defendants are incorporated and maintain their principal place of business in Massachusetts.  <u>United States ex rel. Fadlalla v. DynCorp. Int'l LLC</u>, 402 F. Supp. 3d 162, 177 (D. Md. 2019) ("[W]here . . . a federal statute authorizes nationwide service of process, a national contacts standard applies." (internal quotation marks omitted)); <u>Republic of Pan.</u>, 119 F.3d at 946-47 (explaining that a Fifth Amendment due-process analysis considers "a defendant's aggregate contacts with the nation as a whole rather than his contacts with the forum state").  Further, Defendants have not met the "heavy burden" of showing that the "assertion of personal jurisdiction over [them] would result in 'such extreme inconvenience or unfairness as would outweigh the congressionally articulated policy' evidenced by a nationwide service of process provision."  <u>Denny's, Inc. v. Cake</u>, 364 F.3d 521, 524 n.2 (4th Cir. 2004) (quoting <u>ESAB</u>, 126 F.3d at 627).  Although there may be times "in which a defendant [has] sufficient contacts with the United States as a whole but still will be unduly burdened by the assertion of jurisdiction in a faraway and inconvenient forum," such is not the case here.  <u>Republic of Pan.</u>, 119 F.3d at 947.

In sum, because Plaintiff's RICO and CAVRA claims are colorable, and litigating this case in South Carolina poses no constitutionally significant inconvenience to either Defendant, the court has personal jurisdiction over Bain and Charlesbank as to Plaintiff's RICO and CAVRA claims asserted against them. The court may also exercise personal jurisdiction over the remaining state claims against each Defendant under the doctrine of pendent-claim personal jurisdiction, as Plaintiff's "federal and state claims arise from a common nucleus of operative fact." ESAB, 126 F.3d at 628 ("When a federal statute authorizes a federal district court to exercise personal jurisdiction over a defendant beyond the borders of the district and the defendant is effectively brought before the court, [there is] little reason not to authorize the court to adjudicate a state claim properly within the court's subject matter jurisdiction so long as the facts of the federal and state claims arise from a common nucleus of operative fact."). With that said, because the court's exercise of personal jurisdiction over Plaintiff's state claims hinges on the viability of her federal "anchor" claims, see Geller, 264 F. Supp. 2d at 387-88, the court next turns to Bain's and Charlesbank's Rule 12(b)(6) challenges to Plaintiff's CAVRA and RICO claims.

**C. Whether Plaintiff Has Stated a Plausible CAVRA or RICO Claim**

**1. CAVRA Claim Under 18 U.S.C. § 2255 (Count I)**

Congress enacted § 2255 as part of the CAVRA to address the "multi-million dollar" child exploitation industry and the "lack [of] effective remedies" available to "exploitation victims" "under Federal law." Pub. L. No. 99-500, § 702, 100 Stat. 1783, 1783-74 (1986). Section 2255 empowers victims of certain felonies related to sex trafficking, sexual abuse, and

the distribution of child pornography to recover damages for the harms caused by their abusers.

The statute reads:

> Any person who, while a minor, was a victim of a violation of section 1589, 1590, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423 of this title and who suffers personal injury as a result of such violation . . . may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.  The court may also award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate.

18 U.S.C. § 2255(a).  No criminal conviction is necessary to recover damages.  Prewett v. Weems, 749 F.3d 454, 458 (6th Cir. 2014) (reaching this conclusion after considering the plain meaning of the term "violation," distinct uses of "violation" and "conviction" in neighboring statutes, and civil RICO's violation requirement).  Rather, a plaintiff need only show that the defendant committed one of the enumerated offenses by a preponderance of the evidence.  Id.; Smith v. Husband, 376 F. Supp. 2d 603, 613 (E.D. Va. 2005); Doe v. Liberatore, 478 F. Supp. 2d 742, 755 (M.D. Pa. 2007).

> The complaint alleges that Jane Doe 9
>
> was a minor at the time she was sexually abused and assaulted, sexually exploited, transported across state lines for illegal sexual activity, and/or used in creating or receiving illegal and obscene digital materials in contravention of *18 U.S.C. §§ 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, and 2223*, thus constituting violations of 18 U.S.C. §2255.

(Compl. ¶ 237, ECF No. 1) (emphasis added).  Plaintiff claims that these acts were "enabled by the ongoing certification and ratification" of Varsity, USASF, USA Cheer, Bain, and Charlesbank because Rockstar Cheer was "held out" by those Defendants "as being part of a network of safe and trustworthy cheer coaching gyms."  (Id. ¶¶ 232, 236, ECF No. 1.)  As

explained below, however, Plaintiff has not stated a plausible claim for relief against Bain or

Charlesbank under § 2255.

First, notably absent from Plaintiff's responses to Bain's and Charlesbank's motions to

dismiss is any discussion of the eleven predicate offenses cited in the complaint. Plaintiff

instead spends several pages discussing only 18 U.S.C. §§ 1589 (forced labor) and 1591 (sex

trafficking) – statutes that she did not include in her complaint. The court cannot consider

claims raised for the first time in a response to a motion to dismiss. 2 James Wm. Moore,

Moore's Federal Practice § 12.34[2] (3d ed. 2022); Mylan Labs., Inc. v. Akzo, N.V., 770 F.

Supp. 1053, 1068 (D. Md. 1991) ("[I]t is axiomatic that the complaint may not be amended by

the briefs in opposition to a motion to dismiss." (quoting Car Carriers, Inc. v. Ford Motor Co.,

745 F.2d 1101, 1107 (7th Cir. 1984))); Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836

F.2d 173, 181 (3d Cir.1988) ("[L]egal theories set forth in [a] brief are helpful only to the extent

that they find support in the allegations set forth in the complaint."). To hold otherwise would

effectively allow a party to circumvent the amendment requirements of Rule 15(a).[8] See

Morgan Distrib. Co. v. Unidynamic Corp., 868 F.2d 992, 995 (8th Cir. 1989).

In any event, Plaintiff's § 2255 claim fails on the merits for three reasons. First, Plaintiff

has not pled specific facts suggesting that Bain or Charlesbank themselves committed any of the

predicate offenses alleged in the complaint. (Compl. ¶¶ 209-229, ECF No. 1) (detailing

allegations of abuse committed by Defendant Guyton); Upton v. Vicknair, No. 21-407, 2021

WL 2635460, at *5 (E.D. La. June 25, 2021) (unpublished) ("[A] claim under § 2255 is limited

_____

[8] Even if the court were to consider the new grounds for relief that Plaintiff raises in
her response briefs, Plaintiff has not sufficiently alleged how Bain or Charlesbank violated
§ 1589(b) or § 1591(a)(2).

to a defendant [who] committed the acts described in any of the listed offenses.  Because

Plaintiff does not allege that the City Defendants violated any of the enumerated statutes, this

claim will be dismissed." (internal quotation marks and citation omitted)).

Second, to the extent Plaintiff is relying on a vicarious liability theory, that claim fails

because the complaint does not plausibly allege that Guyton was an agent of Bain or

Charlesbank.  Although § 2255 does not address vicarious liability, the court must assume that

"when Congress creates a tort action, it legislates against a legal background of ordinary

tort-related vicarious liability rules and consequently intends its legislation to incorporate those

rules."  Meyer v. Holley, 537 U.S. 280, 285 (2003); United States v. Texas, 507 U.S. 529, 534

(1993) ("In order to abrogate a common-law principle, the statute must speak directly to the

question addressed by the common law."  (internal quotation marks omitted)).  This theory of

liability thus requires allegations suggesting an agency relationship between Jane Doe 9's

alleged abuser and Bain and Charlesbank.  Meyer, 537 U.S. at 285 ("[T]raditional vicarious

liability rules ordinarily make principals or employers vicariously liable for acts of their agents

or employees in the scope of their authority or employment.").  More specifically, it requires

facts that Bain and Charlesbank both had the right to control Guyton and consented to Guyton

acting on their behalf.  Id. at 286; Restatement (Second) of Agency § 1 (Am. L. Inst. 1958)

(stating that an agency relationship is created when one person agrees with another "that the

other shall act on his behalf and subject to his control").

The court's review of the complaint reveals that Plaintiff has pled no such facts.  The

closest Plaintiff comes to alleging any sort of relationship between Guyton and Bain and

Charlesbank is the generalized claim that the corporate Defendants "relied upon the gyms and

19

coaches" "to provide a guaranteed stream of revenue" "of underage athletes." (Compl. ¶ 131, ECF No. 1.) Nowhere, though, does the complaint allege that there was an express or implicit agreement that Guyton would act on Bain's and Charlesbank's behalf and subject to their control. See Restatement (Second) of Agency § cmt. a (Am. L. Inst. 1958) ("The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and subject to his control."). Plaintiff's failure to adequately allege an agency relationship is fatal to her attempt to hold Bain and Charlesbank vicariously liable for the alleged predicate offenses of her abuser.

Finally, to the extent Plaintiff seeks to hold Bain and Charlesbank secondarily liable under an aiding-and-abetting theory, a plain reading of § 2255 and Supreme Court case law foreclose that argument.[9]

When interpreting a statute, the court begins, as always, with the statute's text. United States v. Bryant, 949 F.3d 168, 174 (4th Cir. 2020). The court "must presume that [Congress] says in a statute what it means and means in a statute what it says." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992). "When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." Id. at 254 (internal quotation marks

---

[9] The federal aiding-and-abetting statute provides that "[w]hoever . . . aids, abets, counsels, commands, induces or procures [the commission of an offense against the United States] is punishable as a principal." 18 U.S.C. § 2(a). Bain, Charlesbank, and the authorities on which they rely seem to conflate vicarious liability with aiding-and-abetting liability. Vicarious liability allows a defendant to be held liable for the bad acts of another simply because of the defendant's relationship with the wrongdoer. Restatement (Second) of Agency § 219 (Am. L. Inst. 1958). On the other hand, aiding-and-abetting liability holds a defendant responsible for his own acts in helping the wrongdoer. Rosemond v. United States, 572 U.S. 65, 71 (2014) ("[A] person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission.").

omitted).  Section 2255 makes no mention of secondary liability, which "by itself is an indication that Congress did not intend to permit such a theory."  Doe v. City of Gauley Bridge, No. 2:21-cv-00491, 2022 WL 3587827, at *13 (S.D. W. Va. Aug. 22, 2022) (unpublished); Boim v. Holy Land Found. for Relief & Dev., 549 F.3d 685, 689 (7th Cir. 2008) (en banc) (Posner, J.) ("[S]tatutory silence on the subject of secondary liability means there is none.").

To be sure, the court recognizes that a few other courts have read secondary liability into § 2255.  See Liberatore, 478 F. Supp. 2d at 756-57; Doe v. Schneider, No. 08-3805, 2013 WL 5429229, at *10 (E.D. Pa. Sept. 30, 2013) (unpublished) (following Liberatore); M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC, 809 F. Supp. 2d 1041, 1053-54 (E.D. Mo. 2011) (same).  In doing so, however, those courts overlooked the Supreme Court's decision in Central Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164 (1994).  Central Bank concerned whether a private cause of action extends to suits against aiders and abettors of securities fraud under § 10(b) of the Securities and Exchange Act of 1934.  511 U.S. at 167.  The Court answered that question in the negative, reasoning that "Congress kn[ows] how to impose aiding and abetting liability when it cho[oses] to do so.  If . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text.  But it did not."  Id. at 176-77 (internal citations omitted).  The Court went on to explain that because "Congress has not enacted a general civil aiding and abetting statute," "there is no general presumption that [a] plaintiff may also sue aiders and abettors" when Congress creates a private cause of action.  Id. at 182.

Central Bank's rationale is not limited to the context of federal securities laws, as "nothing in its holding turns on particular features of those laws."  Boim, 549 F.3d at 689; see

21

also Owens v. BNP Paribas, S.A., 897 F.3d 266, 277-78 (D.C. Cir. 2018) (relying on Central Bank in holding that the pre-Justice Against Sponsors of Terrorism Act version of 18 U.S.C. § 2333 does not permit aiding-and-abetting liability); Freeman v. DirecTV, Inc., 457 F.3d 1001, 1006 & n.1 (9th Cir. 2006) (relying on Central Bank in holding that §§ 2702 and 2707 of the Electronic Communications Privacy Act do not allow for secondary liability). As a result, the court finds the reasoning of Central Bank controlling and declines to read secondary liability into § 2255.

Based on the above, Plaintiff has failed to state a § 2255 claim against Bain or Charlesbank. Count I is therefore dismissed as to both Defendants.

### 2. RICO Claims Under 18 U.S.C. § 1962(c), (d) (Count II)

18 U.S.C. § 1964 provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation" of RICO's substantive provisions found in § 1962. Section 1962(c), in turn, prohibits "any person employed by or associated with any enterprise" that engages in interstate commerce from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." To state a claim under § 1962(c), then, a plaintiff must allege that the defendant (1) conducted (2) an enterprise (3) through a pattern (4) of racketeering activity, Sedima, S.P.R.L. v. Imrex, Co., 473 U.S. 479, 496 (1985), and that the plaintiff suffered injury to "business or property" as a result, Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc., 262 F.3d 260, 264 (4th Cir. 2001). RICO's conspiracy provision, § 1962(d), makes it "unlawful for any person to conspire to violate any of the provisions" of § 1962, including § 1962(c).

22

Bain and Charlesbank challenge nearly every aspect of Plaintiff's RICO claims under §§ 1962(c) and (d).  As explained below, the court finds that Plaintiff has not plausibly alleged (1) RICO standing, (2) an association-in-fact enterprise, (3) that Bain or Charlesbank conducted the affairs of the purported enterprise, (4) that the two Defendants engaged in any racketeering activity, let alone a pattern of such activity, or (5) that they conspired to commit a RICO violation.

### a. RICO Standing

RICO's standing requirement has two elements: injury to "business or property" and causation.  Brandenburg v. Seidel, 859 F.2d 1179, 1187 (4th Cir. 1988).

To begin, the court notes that any personal injuries Plaintiff may have suffered as a result of the alleged abuse cannot confer RICO standing.  Bast v. Cohen, Dunn & Sinclair, P.C., 59 F.3d 492, 496 (4th Cir. 1995) ("[A]llegation[s] of personal injury and pecuniary losses occurring therefrom are not sufficient to meet the statutory requirement of injury to 'business or property.'").  Plaintiff, for her part, argues that her lost ability to cheer competitively and the dues and fees she paid Varsity and USASF are sufficient to satisfy RICO's standing requirement.  The court will discuss the sufficiency of these alleged harms in turn.

### i. Lost Ability to Cheer Competitively

Plaintiff contends that she had an identifiable property interest in the "continued ability to cheer competitively," which would have allowed her to achieve and monetize social media fame, earn an athletic scholarship, and perhaps one day become a cheer coach, gym owner, or event promoter herself.  (RICO Case Statement 48, ECF No. 17.)  This argument lacks merit for two reasons.  First, any injuries that Plaintiff might suffer from having her competitive cheerleading career cut short are too speculative to constitute injury to business or property

23

within the meaning of § 1964(c).  See Price v. Pinnacle Brands, 138 F.3d 602, 607 (5th Cir. 1998) ("Injury to mere expectancy interests or to an intangible property interest is not sufficient to confer RICO standing." (internal quotation marks omitted)).  Plaintiff had, at best, mere expectancy interests in realizing the future financial and business opportunities described in her RICO case statement.  (RICO Case Statement 48, ECF No. 17); see, e.g., Bowen v. Adidas Am., Inc., 541 F. Supp. 3d 670, 679-80 (D.S.C. 2021) (holding that a former college basketball player had an "unrecoverable expectancy interest . . . . in the supposed lost professional earnings he hoped to obtain as a first-round NBA draft pick"); Strates Shows, Inc. v. Amusements of Am., Inc., 379 F. Supp. 2d 817, 827-28 (E.D.N.C. 2005) (finding that plaintiff lacked a property interest in the expectation of a contract even though plaintiff had been awarded the contract "as a matter of course in past years"); In re Taxable Mun. Bond Sec. Litig., 51 F.3d 518, 523 (5th Cir. 1995) ("Anderson's suit shows only a lost opportunity to obtain a . . . loan.  Such lost opportunity by itself does not constitute an injury that confers standing to bring a RICO cause of action.").

Second, even if Plaintiff had incurred concrete losses from being unable to continue cheerleading, those losses could not confer RICO standing as they would be derivative of non-compensable personal injuries – that is, those stemming from the alleged sexual abuse Plaintiff suffered.  RICO's "injury to business or property" requirement excludes from its reach not only personal injuries, but also "pecuniary losses occurring therefrom."  Bast, 59 F.3d at 495; Doe v. Roe, 958 F.2d 763, 768-70 (7th Cir. 1992) (miscellaneous expenses flowing from mental distress caused by arrangement in which plaintiff was coerced into paying for legal fees with

sexual services not actionable under RICO); Grogan v. Platt, 835 F.2d 844, 848 (11th Cir. 1988) (economic damages, including loss of income, resulting from murder not actionable).

For these reasons, Plaintiff cannot state a RICO claim based on any damages resulting from her lost ability to compete in competitive cheerleading.

### ii. Membership Dues and Fees

Next, Plaintiff claims that she has RICO standing based on the "membership dues, fees, and other incidental costs she paid to Defendants." (RICO Case Statement 48, ECF No. 17.)

As an initial matter, the court finds that the sums Plaintiff paid to become a USASF member and compete in Varsity events are sufficient to satisfy RICO's "business or property" requirement. See Reiter v. Sonotone Corp., 442 U.S. 330, 338 (1979) ("Money, of course, is a form of property."). With that said, to establish RICO standing, Plaintiff must also show that Defendants' predicate acts were both the but-for and proximate cause of her alleged injuries. Hemi Grp., LLC v. City of New York, N.Y., 559 U.S. 1, 9 (2010).

Bain and Charlesbank contend that Plaintiffs cannot show causation, relying on Gilbert v. U.S. Olympic Comm., No. 18-cv-00981-CMA-MEH, 2019 WL 1058194 (D. Colo. Mar. 6, 2019) (unpublished), Report and Recommendation adopted in relevant part by 423 F. Supp. 3d 1112 (D. Colo. 2019).[10] The plaintiffs in Gilbert were female taekwondo athletes who allegedly suffered sexual abuse while competing in the USA Taekwondo ("USAT") system. Id. at *1. In support of their RICO claim, the plaintiffs argued that they had RICO standing based in part on

---

[10] Bain and Charlesbank have incorporated by reference the RICO standing arguments made by co-Defendant Varsity Spirit. (Bain's Mem. Supp. Mot. Dismiss 10-11, ECF No. 46-1); (Charlesbank's Mem. Supp. Mot. Dismiss 10, ECF No. 48-1.)

the $50 annual membership fee they each paid the USAT. Id. at *24. The court rejected that argument, reasoning that "Plaintiffs paid $50 in dues to be members of USAT" and "participate in USAT-sanctioned events," not because of the defendants' predicate acts. Id. at *25. A similar conclusion is warranted in this case.

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led *directly* to the plaintiff's injuries." Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006) (emphasis added). In other words, the focus is not "on whether the harm to the RICO plaintiff was a foreseeable result of the defendant's conduct or even whether it was 'the intended consequence[] of [that] behavior,' but rather on 'the directness of the relationship between the conduct and the harm.'" Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co., 884 F.3d 489, 493 (4th Cir. 2018) (emphases removed) (quoting Hemi Grp., 559 U.S. at 12).

In her RICO case statement, Plaintiff states that "[t]he actions of the Enterprise and its conspirators were the direct and proximate cause of [her] injuries." (RICO Case Statement 48, ECF No. 17.) Those allegations, however, are precisely the sort of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," that the court need not accept. Iqbal, 556 U.S. at 678. Moreover, although Plaintiff claims that "[b]ut for the fraudulent assurances to [her] and her parents that the gyms and coaches were certified safe, *the abuse* would not have been perpetrated," (RICO Case Statement 48, ECF No. 17) (emphasis added), nowhere does she allege that she paid dues and fees as a direct result of any party's

purported misrepresentations.[11]  Rather, Plaintiff seemingly paid membership dues and

competition fees out of necessity to participate in events sanctioned by USASF and Varsity.  See

(Compl. ¶ 48, ECF No. 1) ("After forming Defendant USASF, Defendant Webb mandated that

All-Star athletes cheering on behalf of Varsity-affiliated gyms purchase a USASF membership

as a requirement to competing at Varsity-sponsored events."); (Id. ¶ 53, ECF No. 1) ("All-Star

athletes competing on behalf of Varsity-associated gyms pay monthly or annual fees to the gym

as well as annual fees to the Varsity Defendants for competition attendance, uniforms,

accessories, and other related fees." ); (Id. ¶¶ 228-229, ECF No. 1); see also Gilbert, 2019

WL 1058194, at *25.

---

[11] To be sure, a plaintiff asserting a RICO claim based on wire or mail fraud "need not
show, either as an element of its claim or as a prerequisite to establishing proximate causation,
that it relied on the defendant's alleged misrepresentations."  Bridge v. Phoenix Bond & Indem.
Co., 553 U.S. 639, 661 (2008).  The plaintiffs in Bridge were regular participants in a county's
tax lien auctions who alleged that the defendants' false attestations of compliance with the
county's rule prohibiting simultaneous bidding deprived them of their fair share of winning bids.
Id. 642-44.  The Court held that the plaintiffs' RICO claims could proceed even though the
defendants' misrepresentations were directed to and relied on by the county – and not the
plaintiffs.  The Court clarified, however, that

> none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern
> of mail fraud can prevail without showing that *someone* relied on the defendant's
> misrepresentations. . . . In most cases, the plaintiff will not be able to establish even
> but-for causation if no one relied on the misrepresentation.

Id. at 658 (emphasis in original).  In contrast to Bridge, this case does not present a third-party
reliance scenario.  Thus, if Plaintiff (or her parents) did not rely on Defendants' alleged
misrepresentations in paying Plaintiff's membership dues and competition fees, Plaintiff could
not have been injured by reason of Defendants' alleged fraudulent scheme.  After all, "a
misrepresentation can cause harm only if a recipient of the misrepresentation relies on it."
Id. at 656 n.6.

Thus, having not adequately alleged that she was injured "by reason" of Defendants'

predicate acts, Plaintiff cannot state a RICO claim based on the "membership dues, fees, and

other incidental costs she paid to Defendants." (RICO Case Statement 48, ECF No. 17.)

### b. Enterprise

Even if Plaintiff could establish RICO standing, her § 1962(c) claim would still be

subject to dismissal for failure to plausibly allege the existence of an association-in-fact

enterprise.

A RICO enterprise "includes any . . . group of individuals associated in fact although not

a legal entity." 18 U.S.C. § 1961(4). "Such a group need not have a hierarchical structure or a

'chain of command'" or business-like characteristics such as "a name, regular meetings, dues,

established rules and regulations, disciplinary procedures, or induction or initiation ceremonies."

Boyle v. United States, 556 U.S. 938, 948 (2009). Rather, "an association-in-fact enterprise

must have at least three structural features: a purpose, relationships among those associated with

the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's

purpose." Id. at 946.

Plaintiff alleges that all named Defendants formed an association-in-fact enterprise to

"endanger[] [her] and other minor athletes by exposing them to illegal sexual abuse and

exploitation" all while charging them dues and fees "to compete in the self-same system of

abuse." (RICO Case Statement 37-38, ECF No. 17). Plaintiff, though, has pled no facts to

suggest that the Rockstar coaches shared a common purpose with the Varsity Defendants, Webb,

USASF, USA Cheer, Bain, and Charlesbank. Indeed, based on the facts alleged in Plaintiff's

complaint and RICO case statement, the individual coaches and corporate entities had divergent

goals: the coaches sought to prey on minor athletes for their own sexual or personal gratification; the corporate entities sought to retain athletes and attract new ones to generate more money. Cf. Baker v. IBP, Inc., 357 F.3d 685, 691 (7th Cir. 2004) (Easterbrook, J.) (no common purpose where employer allegedly hired undocumented workers to depress wages because the employer "want[ed] to pay lower wages," "the recruiters want[ed] to be paid more for services rendered," and the immigrant-welfare organization "want[ed] to assist members of its ethnic group"); McPeters v. Edwards, 806 F. Supp. 2d 978, 988-89 (S.D. Tex. 2011) (no common purpose because the defendant judge's "purpose in ordering e-filing was to encourage efficiency, while LexisNexis's purpose was to generate profits"); Marshall v. Goguen, Cv 21-19-M-DWM, 2022 WL 1641776, *17 (D. Mont. May 24, 2022) (unpublished) (no common purpose because one defendant "sought to preserve his reputation, while [other defendants] sought to financially benefit off him"), appeal filed, 22-35499 (9th Cir. June 27, 2022). It strains credulity to suggest, as Plaintiff does, that Varsity, its corporate owners, and cheerleading's governing bodies intended to subject the very athletes they relied on as a major revenue source to "illegal sexual abuse and exploitation" as a means of generating further profits. (RICO Case Statement 37-38, ECF No. 17.) In short, without nonconclusory allegations that Bain and Charlesbank shared a common purpose with the perpetrators of the alleged abuse, Plaintiff has failed to allege a RICO enterprise.

### c. Conduct

Even if Plaintiff had adequately alleged the existence of an enterprise, she would still need to allege that Bain and Charlesbank "conduct[ed] or participate[d]" in the conduct of the enterprise's affairs. 18 U.S.C. § 1962(c). In Reves v. Ernst & Young, the Supreme Court

clarified that the "conduct or participate" element requires showing that a defendant

"participate[d] in the operation or management of the enterprise itself." 507 U.S. 170, 185

(1993). Stated another way, the plaintiff must show that the defendant took "some part in

directing" the enterprise's affairs. Id. at 179.

Plaintiff's complaint contains no allegations that Bain or Charlesbank played any role in

directing the affairs of the alleged Varsity enterprise. The extent of Plaintiff's RICO allegations

is that Bain and Charlesbank provided funding to the Varsity Defendants. (RICO Case

Statement 5-6, 25, 42, ECF No. 17.) Providing capital to a member of a RICO enterprise,

however, is a far cry from "participat[ing] in the operation or management of the enterprise

itself." Reves, 507 U.S. at 185. Indeed, RICO "does not penalize tangential involvement in an

enterprise," and "[a]llegations that a defendant had a business relationship with the putative

RICO enterprise or that a defendant performed services for that enterprise" do not trigger

liability. Crichton v. Golden Rule Ins. Co., 576 F.3d 392, 399 (7th Cir. 2009); see Univ. of Md.

v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir. 1993) ("Simply because one

provides goods or services that ultimately benefit the enterprise does not mean that one becomes

liable under RICO as a result."); George v. Urban Settlement Servs., 833 F.3d 1242, 1251 (10th

Cir. 2016) ("[A] defendant must do more than simply provide, through its regular course of

business, goods and services that ultimately benefit the enterprise."). Thus, absent plausible

allegations that Bain and Charlesbank did anything other than provide funding to Varsity in their

roles as corporate owners, they cannot be held liable under § 1962(c).

### d. Racketeering Activity

Lastly, Plaintiff's § 1962(c) claim fails because she has not plausibly alleged that Bain

and Charlesbank committed two predicate acts of racketeering activity.  See, e.g., DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001) ("The requirements of section 1962(c) must be established as to each individual defendant."); In re Wellpoint, Inc. Out-of-Network Rates Litig., 865 F. Supp. 2d 1002, 1035 (C.D. Cal. 2011) ("Where RICO is asserted against multiple defendants, a plaintiff must allege at least two predicate acts by *each* defendant." (emphasis in original)); Kerrigan v. ViSalus, Inc., 112 F. Supp. 3d 580, 605 (E.D. Mich. 2015) (same).

"RICO is founded on the concept of racketeering activity." RJR Nabisco, Inc. v. European Cmty., 579 U.S. 325, 329 (2016).  The RICO statute contains an exhaustive list of predicate acts that qualify as "racketeering activity."  18 U.S.C. § 1961(1).  Included in the list is "any act which is indictable under" 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud).  18 U.S.C. § 1961(1)(B).

To state a claim for mail or wire fraud, a plaintiff must plausibly allege: "(1) the existence of a scheme to defraud and (2) the use of the mails or wire communication in furtherance of the scheme." United States v. Curry, 461 F.3d 452, 457 (4th Cir. 2006).  Because the "gravamen" of mail and wire fraud "is the scheme to defraud," Bridge, 553 U.S. at 647, even "innocent" or "routine" mailings or wire transmissions can satisfy the second element as long as the use of mail or wires somehow furthered the fraudulent scheme, Schmuck v. United States, 489 U.S. 705, 715 (1989).  Nevertheless, "a plaintiff still needs to allege a material misrepresentation as part of the defendants' scheme to [de]fraud to state a violation of section 1341 or 1343." Williams v. Affinion Grp., LLC, 889 F.3d 116, 125 (2d Cir. 2018); Neder v. United States, 527 U.S. 1, 25 (1999).

A plaintiff relying on mail or wire fraud as predicate acts must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  Jones v. Ram Med., Inc., 807 F. Supp. 2d 501, 513 (D.S.C. 2011).  Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting [the] fraud."  Those circumstances include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby," Edmonson v. Eagle Nat'l Bank, 922 F.3d 535, 553 (4th Cir. 2019) (internal quotation marks omitted) – or more simply, "the who, what, when, where, and how of the alleged fraud," United States ex rel. Taylor v. Boyko, 39 F.4th 177, 189 (4th Cir. 2022) (internal quotation marks omitted).

In this case, Plaintiff falls well short of plausibly alleging that Bain or Charlesbank committed mail or wire fraud.  Plaintiff has not identified a single misrepresentation attributable to Bain or Charlesbank – let alone when it was made or how it was false or misleading.  See Xia Bi v. McAuliffe, 927 F.3d 177, 184-85 (4th Cir. 2019) ("How and whether a party relied on a misstatement is every bit as much a 'circumstance[] constituting fraud' as any other element." (quoting Fed. R. Civ. P. 9(b))).  For this reason alone, Plaintiff has failed to state a plausible § 1962(c) claim against Bain and Charlesbank.

### e. RICO Conspiracy

Plaintiff's RICO conspiracy claim under § 1962(d) is also deficient.  Because Plaintiff lacks RICO standing and has not adequately alleged the existence of a RICO enterprise, she cannot assert a § 1962(c) claim against any Defendant.  Without a viable § 1962(c) claim, her conspiracy claim under § 1962(d) necessarily fails, too.  GE Inv. Priv. Placement Partners II v.

Parker, 247 F.3d 543, 551 n.2 (4th Cir. 2001); Foster v. Wintergreen Real Estate Co., 363 F.

App'x 269, 275 n.6 (4th Cir. 2010) (unpublished).

      Even if Plaintiff had sufficiently alleged a substantive RICO violation, her § 1962(d)

claim would still be subject to dismissal for failure to state a claim.  "To satisfy § 1962(d), the

plaintiff must establish two elements: (1) that two or more people agreed that some member of

the conspiracy would commit at least two racketeering acts (i.e. a substantive RICO offense)

and, (2) that the defendant knew of and agreed to the overall objective of the RICO offense."

Borg v. Warren, 545 F. Supp. 3d 291, 319 (E.D. Va. 2021).  In describing the alleged

conspiracy, Plaintiff states that Defendants "operated as a single unified entity with the common

goal of taking billions of dollars from minor athletes who wanted to be a part of Defendants'

All-Star cheer world" and that Defendants "act[ed] as a collective group" in "endangering

[her]."  (RICO Case Statement 47, ECF No. 17.)  Apart from these conclusory allegations,

Plaintiff has alleged no facts tending to show that each Defendant agreed that some member of

the conspiracy would commit at least two racketeering acts.  See Chambers v. King Buick

GMC, LLC, 43 F. Supp. 3d 575, 607 (D. Md. 2014) ("[B]ecause the core of a RICO civil

conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the

very least, must allege specifically such an agreement."  (quoting Hecht v. Commerce Clearing

House, Inc., 897 F.2d 21, 25 (2d Cir. 1990))); Walters v. McMahen, 795 F. Supp. 2d 350, 355

(D. Md. 2011) (stating that a plaintiff bringing a § 1962(d) claim must "describe in detail the

conspiracy, including the identity of the co-conspirators, the object of the conspiracy, and the

date and substance of the conspiratorial agreement").

For these reasons, Plaintiff has failed to state a valid § 1962(d) claim against Bain and Charlesbank.  Count II is therefore dismissed in its entirety as to both Defendants.

### D. Pendent-Claim Personal Jurisdiction

Having found that Plaintiff has not stated a plausible CAVRA or RICO claim under Rule 12(b)(6), meaning there is no viable anchor claim, the court declines to exercise pendent-claim personal jurisdiction over the remaining state-law claims against Bain and Charlesbank.  Bettis, 976 F. Supp. 2d at 751 ("If . . . the court dismisses [the] federal claim providing personal jurisdiction – also known as the 'anchor' federal claim – early in the litigation, the court may, in its discretion, dismiss the remaining federal and state claims."), aff'd, 693 F. App'x 190 (4th Cir. 2017) (unpublished); Geller, 264 F. Supp. 2d at 387-88 ("[I]f the court were later to determine that the federal claim(s) should be dismissed against a defendant, the state claims against that defendant would also have to be dismissed, unless another basis for asserting personal jurisdiction exists."); United States v. Botefuhr, 309 F.3d 1263, 1274 (10th Cir. 2002) (holding that the district court abused its discretion by retaining jurisdiction over remaining claims after dismissing the anchor claim).

It is therefore

**ORDERED** that Bain's and Charlesbank's motions to dismiss, document numbers 46 and 48, are granted.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
June 27, 2023

34